Good afternoon, Frank Weiser on behalf of the appellant, Amit Shah. I wanted to address first the issue of whether there was in fact a physical search of the motel registry, because I think that was an issue that I'd actually like to back up and start with what I think is a question precedent, which is I was on the prior panel in the appeal in this case, and we sent this case back down on a very narrow theory. We rejected all of the claims, Fourth Amendment claims, with respect to the entry into the motel. We broke it down into three theories, and the only thing we sent back was a Patel theory, a theory that the search was carried out pursuant to the condition in the CUP. That was it, and you could bring back the mandate claim. I don't see anything in the briefs or how this case has come back to us that talks about a search being conducted pursuant to the condition in the CUP. So I'm not sure that anything we're talking about isn't in violation of the law of the mandate, because we didn't send this case back down for any of what is brought back up to us as I'm reading this. So, Your Honor, I think that was an issue, as I understood it. The prior panel that you were on was an issue that you had reversed on the Fourth Amendment issue, and the Fourth Amendment issue was connected to the Patel issue. But whether, in fact, it was subject to a search pursuant to the CUP was a Monell claim, and there was nothing in the motion for summary judgment that even raised the Monell claim. The only defendant is the city, so the whole case is a Monell case or nothing. And on page 6 of our ruling, we broke it up into three claims. Shaw claims his Fourth Amendment rights were violated based on the unlawful entrance in his personal residence. AGI claims his Fourth Amendment rights violated based on the entrance and trespass into the motel. And then the third was the guest record search. And we just affirmed the dismissal with prejudice on Monell grounds of the first two claims. So we didn't send anything back about how the officers got into the motel. That was out of the case as it went back down. So I don't know why the district court on remand litigated and resolved how the officers got into the motel. We didn't send that back. It was out of the case. And I think the understanding was between the parties that Judge Fitzgerald originally dismissed the First Amendment complaint or the Second Amendment complaint, whatever it was, on the basis of Monell on the pleading, saying that there was nothing that was pled that would establish Monell. When it was reversed, I think the understanding was the whole Fourth Amendment claim had come back. And that's what our ruling says, unambiguously not what it says. And we can't, we don't, we're not writing essays to just be sort of tossed aside. Our instructions have to be followed on remand. And I just don't see that that happened here. And it seems to me that the Monell claim, the issue of the Monell claim, is intertwined with the underlying constitutional violation. You can't argue with Monell if you don't have a constitutional violation. But we said there was only a sufficient, everything failed, because the two elements of Monell is there's a violation and the connection to city policy or practice. And we said as to two of the theories, there's no connection to the city, so the second element fails, those are out of the case, they don't go back. What goes back is the CUP condition. And if you were claiming that the search took place pursuant to the authority of the CUP condition, then the city could get tagged with that meeting the second element of Monell. But I don't even understand that you're even claiming that the search was carried out pursuant to the CUP condition. Well, I would argue, Your Honor, that was not litigated. What the city did in their motion for summary judgment was make the claim that there was no Fourth Amendment search, period, and therefore it should just fail as a matter of law that there was no constitutional violation. Under Nissan Fire, and putting aside for a second what the district court understood the reversal to be about, but under Nissan Fire, the city had still a burden to bring up the issue of the CUP. Well, as they move for summary judgment on the claim, I think it would have been incumbent on you to say, wait a minute, I have a claim that they carried out the search pursuant to the condition in the CUP and that the CUP condition violates the Supreme Court's decision in Patel. That should have been your response. That wasn't your response. You didn't ever argue that. Well, I disagree. I respectfully disagree. I mean, my understanding of the reversal was a bit different. I thought that the Fourth Amendment claim was at issue and, of course, Monell would be at issue. And whether Monell was tied to the CUP, of course, that would be at issue also. But did you ever argue below, much less present evidence to create a triable issue of fact on summary judgment, did you ever argue below that the search was, in fact, carried out pursuant to the CUP condition? No, because if one looks at the statement of genuine facts, of undisputed facts, there was no discussion, no evidence produced that it was in any way tied to the issue of the CUP. So there was nothing that under Nissan Fire I believed I had to respond to. I didn't respond on the Monell claim period because they had not raised that. And under Nissan Fire, that's not my burden. Judge Fletcher made that very clear when he authored Nissan Fire. Summary judgment against you, and you think they've misunderstood your claim, and you think you have a theory that they've overlooked. It's your burden to tell the district court in response on summary judgment, wait a minute, my claim is different, and here's my evidence in the claim they're overlooking. But what you're telling me is you never raised the CUP claim on remand. It was never raised in the summary judgment motion, and I believe I cited Nissan Fire, although I cited Nissan Fire also with respect to the writ of mandate claim. But Nissan Fire is very clear. I don't have any obligation to raise that. If they are not raising that in their summary judgment motion, or if the judge doesn't raise it, in a summary judgment under Nissan Fire, Rule 56, a plaintiff could possibly not even respond, but the burden is still upon, for a burden of production, the initial burden of production is on the party making the motion for summary judgment, here being the defendant's city. The city never raised CUP. They never even raised Monell. All they raised was this is a Fourth Amendment, this was not a Fourth Amendment search, for whatever the reasons they gave. So I had no burden to respond to that. And I think that's very clear under this circuit's case law. I don't know. Yes? Counsel, I suppose you were to prevail on these procedural points that you were discussing. Tell me why there isn't voluntary consent to entry, because the cops knock on the door of the motel office and the co-owner of the motel lets them in, and why there isn't plain view for looking at the registration papers on the table in the motel office, part of the motel office that's open to the public. So, Judge Glanfield, let me take the first issue about the knock on the door and the consent. Can I know your answers to both? Okay. The cases that the city cites, the United States versus the Neaton case at page 27, I think the United States versus Casper case at page 28, that's a 2007 Ninth Circuit case. My view is those cases are outdated. My view is they've been overruled by Florida versus Jardim, Justice Scalia's decision in 2013. And the knock and talk rule has to be limited or somehow circumscribed by Florida versus Jardim. In Florida versus Jardim, the policemen went in with a dog, a search dog, up to the front door, and the dog sniffed drugs. All they did was go to the front door, just as a mailman can go, just as any other person can go, and could knock on the door. But Justice Scalia said that under the property test of the Fourth Amendment, based on his decision in the United States versus Jones, he said the issue is not that. It's quite simple, that there has to be a common law license to do so. And he found there was no common law license for a police officer, as opposed to a mailman, as opposed to a salesman, to go up to the front door to do so. And so my view is is that the knock and talk rule is not fully delineated anymore under those old laws. And that's number one. For a motel where they're trying to rent rooms, that's how they make a living. With that set the residential. Nobody, anybody was invited to knock on the door of the office. Most motels, the office is open. But in bad neighborhoods, they're sometimes locked to give the managers a little screening opportunity. So to answer that, Your Honor, this was not a knock on the motel. When a motel has a license, you're certainly correct. For purposes of the motel, somebody goes up to the lobby of the motel, and they want to rent a room, they have a right to do so. That's different. But when it comes to the residence, this was the residence. The motel had a residence portion, and it had a portion with a window. Maybe I'm envisioning this wrong. I thought it was what you sometimes see in motels where the owners or managers live in rooms that are behind the registration room. There's a room where people register and pay money into the key, and then behind that is where the owners have their kitchen and bedroom. But the door here was to the residence portion. It was not to the area where one goes and registers. They originally went and did their undercover operation at the place of the motel where one registers. Then after they did the undercover operation, went to the residence area and knocked on the door. So it was similar to just going up to a regular house. The second point is that even under the dock and talk rule, and even under the idea of being able to go in with voluntary consent, the issue of scope of consent is limited. I mean, the cases, the old cases even say if there's subterfuge or what the scope of the consent is, and the police exceed that, then the consent just doesn't operate anymore. So either they came in and said, we want to talk to you. They obviously wanted to. For one of my other questions, I don't want to lose the opportunity to get your answer to it. Let's just suppose they're in there with consent. Why can't they look at the things that are out on the internet? Well, my view is, once again, I think the OSV jailings and Justice Scalia's decision, and of course Judge Watford's en bloc decision in the governor's city of Los Angeles, affirmed, of course, by the Supreme Court in the city of Los Angeles versus Patel, made a sea change. And that sea change in Fourth Amendment law, I think, also affects the issue of the Plain View Doctrine. I think the Plain View Doctrine, when one looks at Horton versus California, Justice Stevens wrote the opinion at Horton, but that was based on a reasonable expectation of privacy, something that's in plain view. If you're lawfully in the residence and it's in plain view, one cannot claim that they have a reasonable expectation of privacy to the particular object. And Justice Stevens said, based on that, then one can certainly search it and one can certainly seize it for that purpose. But once you look at it from the property prong and under U.S. v. Jones, even a minor touch or physical intrusion, the very slightest physical intrusion, is now a search. And if you look at Jones, you'll see that it's very interesting. The attachment of the GPS device that was tracking a car on public streets, the previous case law of the Supreme Court was Knox versus United States. That's when they tracked a car on public streets with a beeper. And there was no reasonable expectation of privacy. Therefore, there was no Fourth Amendment search. But now under Jones, because there was a physical intrusion on the car, that becomes a search. One question just about how the examination of the hotel registry occurred. What was the book open to the page? Did the officers just look at the page that was open, or did they have to open the book? And that's what I had originally initially wanted to talk about when I first came up to the podium here, and that is the evidence that the city put in for the motion, summary, judgment, and Fourth Amendment search. And I believe, and I'm going to cite to the record soon because I want to make sure I make an informed discussion of it. I think it's at page 15 of my brief, and they exit volume four of the excerpts of record. I believe it's at pages 617 through 621. They cite Mr. Shaw's deposition testimony only. That deposition testimony goes back to volume three, page 407 of the excerpts of record. It's page 93 of his deposition. He clearly says that they picked up the motel registry and put it back. They touched it. They went through it. They didn't seize it. They only seized the $20 bill, but they searched the records. And Judge Fitzgerald rejected that, but it was clearly in their own statement of genuine issues, of nondisputed issues. So it seems to me that you have the issue of Patel. The registry is clearly protected, the general registry, and it's not clear what they went through, but it seems to me the reasonable inference is that the registry included more than just the card they filled out. And so those are papers, a category under the Fourth Amendment, as you yourself authored, Your Honor, and therefore protected and presumptively unreasonable without a warrant. And I would also argue that plain view doesn't apply for another reason, because once you have Patel and the limitations of Patel, Hortoning and the plain view doctrine makes it very clear you have to have lawful access to the property that you're going to seize. I thought it was in the book. I thought it was just loose papers on the table. I didn't hear that. Oh, I thought it was not a registration book. No, it was a registry, and if one looks at the. . . I thought it was just papers stacked on top. No, it was Motel Registry, and Mr. Shaw testified to that. I'm looking at Shaw's deposition, or testimony, rather. That's where I got that, perhaps. So I'm looking at page 407 of Volume 3. It says, okay, question. At line 2, did they search. . . I think this is Mr. . . . This was closing counsel who asked, did they search anything in your office? Answered by Mr. Shaw, they come to the office, and they tried to look at my papers. Question, which papers? Answer, the registry and parts. Question, how do you keep. . . Answer, we have a small table. That only question, okay, and are they out in the table? Answer, they just were searching other people all overnight. I just put the ID. I didn't put anything there because I was going to the bathroom. So he took ID and then just put the paper and then put it back. That's where I got the impression he was just looking at loose papers and not the registry. Well, I understood it, or at least there's, I think, some inference that it could be understood that it was also including the registry. But certainly even papers are a category under the Fourth Amendment, and they would not have a right to do it. And I understand, or at least I think there's a reasonable inference in what Mr. Shaw testified, that they did more than they looked at IDs or they perused through other people's registers. So to me, Judge Fitzgerald, the Plain View Doctrine simply has to be limited. I think, as I said, Jones and Patel have done, have created a sea change in law, and it's presumptively unreasonable. You're well over your time. Why don't we pause there and let's hear from the assistant attorney and then we'll leave you some time. Thank you. May it please the Court, Charles Sewell for the City of Los Angeles. Can you start with the question that Judge Collins posed to your opponent? Because I tried looking at the memo just now. I don't understand why you did not say, why you didn't focus on his narrow Patel claim that our court sent back and instead engaged with the plaintiff on this very different general Fourth Amendment search and seizure claim. Understood. I have sort of a cowardly way to answer that and then a substantive way. I didn't prepare the summary judgment motion in this matter. Looking at the memorandum, though, I see we didn't frame it specifically that way. Substantively speaking, though, it's clear that the memorandum said that the first two theories, that your decision found that their inability to plead Monell was fatal, and it limited plaintiff's ability to pursue the Fourth Amendment claim to the Patel theory, which is the same theory that they alleged in their Third Amendment complaint, where they said very specifically that the testimony here didn't match the allegations. The theory in the Third Amendment complaint, which Mr. Weiser is arguing today, is that they knocked on the door and they said we're here pursuant to the CUP conditions, 4149 investigation. The discovery went forward on what should have been this narrow Patel claim. Correct. And you should have moved for it. But we don't need to relitigate what you did, but it just seems to me. We didn't frame it properly. We didn't frame it properly. They have no evidence. In fact, we just heard them say they're not even contending that the search occurred. Yeah, and there's another issue. As I look at it, we didn't frame it properly. I can see that. Looking at it, it also says AGI. The Fourth Amendment claim is to AGI, Akshar Global, which is the corporation that owned that, and they've since been dismissed. Prior to this appeal, they were dismissed, and their theory of recovery was limited to just recovery for emotional damages based on Mr. Patel's, Mr. Shah's testimony. The grounds on which AGI was dismissed. That was pursuant to a stipulation. There was a discovery dispute, and that was the resolution, and that is in the excerpts of record. Okay, and that was after the remand. Correct. Actually, I can't recall the timing right now, but there's a stipulation that's in the excerpts of record that says, clearly, we're limiting our claim to emotional damages based on Mr. Shah's testimony only, and we are dismissing Akshar Global and all claims brought by Akshar. So would AGI have been the only proper plaintiff to have made the claim under Patel? I believe at the time Mr. Shah was the operator and Akshar was the owner, and that situation, I think, changed in 2018, where Mr. Shah became the owner and purchased that from the corporation, however that was done. So I don't know. At the time, you could arguably say that Akshar Global was the owner of the hotel, so they were the only ones that can bring the Fourth Amendment claims based on, you know, an entry into their residence, although Mr. Shah was a resident of that location. And just to clarify that one point, when he says that that was just his room, he also says in his testimony that that's where the guest registry was. Now, I'm really confused because we divided up the claims very clearly in the prior decision, and what we sent back was AGI's Patel claim based on the theory that the search of the records, not of anything else, not the entrance, but the search of the records, was accomplished pursuant to the authority of the condition and the CUP. And then both that theory was seemingly ignored and abandoned, and then AGI, the only plaintiff in that claim who was remanded, was then dispensed. That would have been another great argument. So, yes, I understand your confusion based on that, that it was limited to who has a possessory interest in the records, and it was Akshar at that time. They would be the only plaintiff that could bring that claim. So, okay. And, you know, I have a follow-up question on that. Sure. You said that there was a transfer that occurred in 2018 where, I guess, Mr. Shah, the individual acquired all of the assets. That's correct. He went from being an operator to an operator and an owner. Including, I guess, whatever claims Akshar had pending. I do not know. I do not know. That was just for practical purposes of operating the hotel at that point. So, what are we supposed to do then? You filed this brief before us that says nothing about any of this. Is your position now that we should not entertain the arguments? I think you should entertain all of that. I just don't know if there's a waiver argument. I'm not prepared to go off the cuff to say whether or not the city waived its right to raise that argument. It's clear from reading the memorandum that there are two valid arguments. The testimony, what we did here was there's a difference. There's a split on what happened on May 24, 2016. The LAPD says they did an undercover investigation and referred it to the city attorney for prosecution. And the Shahs contend that they were actually there and that he was cited that night for a violation of Penal Code 316. So, that actually occurred, we believe, in March of that year. They did enter the hotel and he was cited. But the claims are limited to May 24, so we went with their version of events that occurred on May 24, 2016. And based on that, I don't think either of the issues that were raised, the testimony that was raised by the Shah, by Mr. Shah and his wife, concerning that evening would address this court's opinion. Remember, I don't want you to prevail. There are two steps that you have to succeed on. One is to convince us that consent was freely given, right? Correct. So that the officers were lawfully in the place. And then, second, I think that somehow, I don't even know under what theory, that just because a, I'm going to assume because we have to construe the facts and the like, most favorable to the plaintiff that the book was closed and it was sitting on a table and the officers picked it up, opened it, and flipped through it to find whatever information they were looking for, that that somehow qualifies under the Plainview Doctrine. And it seems to me there are real problems on both of those fronts for you. So maybe, I mean, Judge Kleinfeld wanted to make sure that we heard. I want to hear what you have to say on both. Absolutely. I think the consent issue is governed by United States v. Cormier, and it lays out the factors and then clearly says the totality of the circumstances. So we did this all based on the testimony of Mr. and Mrs. Shah. The officers were there conducting an undercover operation. They had, one of the officers had had a conversation with Mr. Shah where he said, I'm here with a prostitute. I want to get one of your rooms. He even obtained a condom from appellant. And they came back after the investigation for their testimony and knocked on the door. There was no kicking in of the door. There were no threats. There was no coercion. But Mrs. Shah, she never says that I opened the door, the officers asked me if they could come in, and I said, yes, come in. That was consent. She never says that. The testimony says that they asked to come in. She looked out, saw them, and opened the door to let them in. It says she heard a loud knock on the door. She opened it. There were all these officers there, and they came in. And I think, I don't know if it was you or one of your colleagues asked, did you let them in? And she says, yes. But let them in in that context? I mean, it sounded like they were coming in, and she just didn't bother to get run over. So, yeah, she let them in in the sense that she perhaps stepped aside because they were coming in anyway. But there's no testimony where she, I don't know if you're going to tell me if I'm wrong, but I don't remember seeing anything. The officers asked, hi, ma'am, we're here to do whatever. Can we come in and search your hotel guest registry? Where she said, yes, please come in. You're welcome to do that. I didn't see that testimony. You know, I understand what you're saying. I don't think that's what the testimony says. She said, police knock on the door, and then because they knock, once you know the gun and everything is there, so they're police. So I open because I have to open with police coming in. Right. And I have another question. I think that you saw when I eventually asked you, did you let them in? And she says, yes. But what does that mean? In the context that she's scared to death, there are seven officers with weapons there. I got the impression that they were coming in when she opened the door in response to their knock, and she did not try to bar them in. She's one woman in the face of seven officers. I understand. That's not how I read it. That's on ER 538. She says, there's the window. I did. There was no police, but all of a sudden they came and knocked the door, and I opened. And they said, yeah, we are undercover police. I think one has a jacket or something like that. And Mr. Hagan says, okay. And she says, yes. So that's why I opened the door. So I thought. No, they knocked. They asked if they could come in, and I said yes. And then they went and locked the door and let them in. Is that correct in audible response? So it's implied. It says, no, they knocked. This is on 539. They knocked. Like everybody said, hard knocking. That's it. No breaking down. Right. So it's implied from the testimony. I'm saying we're on summary judgment. We have to construe the facts in the light most favorable to the plaintiff. Right. Is it anywhere where consent was given? Like literally, may we come in, ma'am? Yes. Please come in. I think from the testimony, I understand what you're saying. I respect that. But I think testimony clearly, the only implication is they knocked on the door. She looked out, saw who they were, and opened the door for them. And under the totality of the circumstances, I would note these were people. Mr. and Mrs. Shaw, there had been an up-front investigation that same month. Early, I think it was May 2nd, where the police and the Department of Building and Safety conducted an up-front investigation. That's at ER 211 and 238. I'm going to ask you about the scope of the plaintiff,  The district court's rationale was that, well, the register would obviously contain, you know, evidence of the crime they were looking for. So to see the register on plain view, you're seeing incriminating evidence in plain view, equivalent to seeing, you know, the loaded firearm or the, you know, drugs right on the table. I'm not quite sure the analogy works. Suppose, for example, they were investigating an elaborate financial fraud claim. And they get into the home office. They're voluntarily let in, and they see there's the file cabinet. That's going to have the documents. They take it and they put it on the truck. How is that different from this case, and is that okay? I think what you have to understand here, this has been known as a house of prostitution, and this is in the record since 2011. This is 2016. The officers were there that night specifically to conduct an investigation for a violation of Penal Code 316, which is keeping a disorderly house, basically a brothel, and for potentially, you know, violation of any other section of the municipal code. In the police report that's in the excerpts of record, the officer specifically says, on prior occasions when I was at this hotel and I was conducting an undercover operation, they didn't take my information. They didn't write it down. They left it blank. There is evidence in the planning file that led to the revocation of the CEP where one of the witnesses that the police had talked to, who was a John, said, yeah, they never take my information down. That's why we go there. That's a probable cause. I mean, suppose you have a probable cause that a particular person is engaged in training child pornography, and you go knock on the door, and he lets you in, and as soon as you're in, you see the computer there. Plain view. Grab the computer. Right. Is that, how is this case different? And then you just take it back and you rummage through the? Well, I guess my point is the officer said, I gave you my ID, I gave you $20, and I said, hey, I'm here to conduct an act of prostitution in your establishment, and he didn't observe him writing his information down. When he came back to the room per their testimony, he looked at the registry to see if he had written his own information down, and he says it clearly. Counsel, I'm not clear on exactly what the police could see and what they had to flip through papers or the registration book or both to know. I had the impression that there are loose papers on the table, and the police could see the undercover officer's ID, the one who said, I went into the Hot Chief Motel and showed him my fake ID, and I think bought the condom. I believe that's how those stupid signs happen. No, I can't tell exactly what the cops could see with their eyes before they flipped through the stuff, nor am I clear on whether they had to flip through the registration book or whether it had anything to do with anything, as opposed to loose papers, since the manager said he had to go to the bathroom, so he never had put the information into the registration book, if I remember right. I think this falls under Hilliard. This is reasonable suspicion to conduct a brief inspection. He said the papers were on the table in a book, implying it was open or loose, and there's two reasons why it's both incriminating in nature and sufficient reasonable suspicion to conduct an inspection. That's because, one, it would be evidence of a 316 violation, because if you were taking money from people, giving them condoms, and not writing down their information, that is consistent, as stated in the police report. You have to go to the bathroom. Can't you just go to the bathroom and then finish the process of writing it in a book? This allegedly had occurred after he'd already given it to him. He didn't testify that, I was going to do that. There was no testimony to that effect. He just took it, he processed it, and didn't write down the information, and the officers, it appears, were just verifying that after the incident, according to their testimony, according to the testimony of Mr. Shaw. That's what they did. And also it would be reasonable suspicion in and of itself of a violation of keeping a proper registry under 4149. And I'd just like to say, I see I'm running out of time, but I'd just like to say Patel does not apply here at all. That was a facial challenge under an administrative warrant, exception case. There's nothing like that occurring here. This was not an investigation where they knocked on the door and said, let us in for the purposes of checking your records in violation of Patel without pre-compliance review. They were voluntarily allowed into the location, and when they were there, they observed something that is clearly not an element, but directly related to a 316 violation, and in and of itself a violation of Municipal Code 4149. You mean when you refer to those 316 and 4149, you mean the obligation to register the guests in your registration book? That's 4149. 316 is keeping a disorderly house, running a house of prostitution, and what the officers were saying is one of the reasons. On the second one, a lot of people do their paperwork later, after they're done, sometimes a rush of business. Sometimes they really have to go to the bathroom bad, and it gets interrupted. And what you're saying is, well, the Shahs never testified that they were interrupted that way, but the cops didn't testify to the contrary. Their report does, Your Honor. They never take information down. They've been running a house of prostitution for seven years at least, and that 108 motel is known as a place where they do not write the guest's information down when they're staying there for an hour with a prostitute. That's in the police report. Oh, that was sworn to? Yeah, that's in a report, yes. Well, that's the investigation report from May 24th. I'm sorry. That's not responsive. Usually police reports are not admissible. It's evidence in the absence of special circumstances because they're not sworn to. In this instance, if we're just relying on testimony of Mr. Shah, like I said, all I can say on that is that he didn't testify that I didn't fill it out because I had to go to the bathroom first. But whether he did or he didn't, the fact that it hadn't been filled out is relevant. That's a reasonable suspicion to at least flip through to see if it had been filled out. So that just because he could have made that argument later at trial doesn't mean that the officer at that moment didn't have reasonable suspicion to conduct a brief inspection under the logic of Hillyard. Okay. Thank you. Thank you very much. Let's put that on the top for a moment. Just very briefly, to address Judge Collins' concern, I do want to point out that consistent with what had been pled, the particular search led to Mr. Patel's or the revocation of the CUP. And that was specifically placed, that evidence was placed for purposes of the revocation. And I think what we had originally argued was that there was a policy and the CUP carried out that policy to in fact revoke his ability to run the property. So I just want to point out that there was a tie to the CUP in terms of the search. I think the face of the CUP, which was not in evidence, also would support that. What was the tie then? The fact that they charged Mr. Patel with a 316 and 4149 led to the revocation of the CUP. And it was tied in with the CUP. Okay. But you're still not claiming that the actual rummaging through the register on this particular day was undertaken pursuant to the CUP? I think it was. I think the overarching policy that we talked about before the remand, when it was remanded, if one looks at the original complaint, the first submitted complaint, was the fact that there was a policy by the city to adopt the CUP to run a lot of business and that the CUP was the motivating factor for the search. They were coming there to obtain evidence to show that there was a violation of the CUP. And in fact, that's what happened. Is there any evidence that they, in their communications with the owners, that they told them that they were allowed to look at the book because of the condition of the CUP? No. There's no evidence of that? No discussion of that? No. In fact, Mr. Shaw, and I think it's a matter of dispute, I recognize that it's a matter of dispute. The city, I think, says there were two officers, if I'm not mistaken, two or three officers. I think two came in. Mr. Shaw, whether it was his version is nine officers, but once again, for summary judgment, what takes his view? But putting that aside, he was very emphatic by saying that nine officers to the fact that he came out of the bathroom and he was confronted with these multiple officers who then just went and shuffled through the papers and took the ID and took the time. Can you address the significance of the dismissal of AGI after the remand? Pardon me? Can you address the dismissal of AGI after the remand?  What was the rationale? So I think what happened was AGI, he was related to the owner of AGI, and AGI is a relative of his. They're somehow related by marriage or whatever, and AGI eventually sold the property to him. When we had a discovery ongoing before the motion for summary judgment, I learned that AGI was suspended, and so I stipulated to dismiss AGI. But by the time that Mr. Shaw, this claim came up, Mr. Shaw was the owner. He was the owner and the operator. Did he own it through a corporation or he owned it just direct? He owned it as I understand directly, as I understand it. So, but the point I want to emphasize is there is a connection to the CUP. Clearly, the CUP was the motivating factor. The CUP was eventually revoked as a result of this particular search. So I think there is some basis even if we were to argue now, which we're not, and I don't believe we have an obligation as I argued earlier. As to 4149, I think it was a statement by Mr. Sewell about Patel doesn't apply. Patel applies for two reasons. Patel established that the registries are papers under the Fourth Amendment. So whether in fact you want to talk about whether pre-compliance review or not, it established the proposition that what they in fact physically intruded on was a category protected, directly protected under the Fourth Amendment. That's number one. And number two, if the scope of the search exceeded just the issue of the particular suspicion they had of a crime, and they're talking about papers over and above that, then the pre-compliance review issue does come into play. So it seems to me that Patel does have relevance here. With that, I would submit. Thank you very much. I appreciate both of your arguments. The case just argued is submitted, and the court is adjourned for this sitting.
judges: KLEINFELD, WATFORD, COLLINS